**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 25-21930-Civ-BECERRA/TORRES

FENYANG AJAMU STEWART,

*Plaintiff,*

v.

ROYAL CARIBBEAN CRUISES, LTD.,

*Defendant.*
_______________________________________/

***OMNIBUS ORDER ON THE PARTIES' MOTIONS CONCERNING EXPERT TESTIMONY [D.E. 73, 77, 80, 81]***

This Order addresses four motions directed to expert testimony: (1) Plaintiff's Motion to Exclude or Limit the Opinions and Testimony of Defendant's Security Expert Michael S. D'Angelo [D.E. 73]; (2) Defendant's Motion to Strike Plaintiff's Hybrid and Pro Se Expert Witness Disclosures and to Preclude Plaintiff from Offering Expert Testimony [D.E. 77]; (3) Defendant's Motion to Strike Plaintiff's Rebuttal Expert Disclosure of Donna Ivery, Ed.M., RBT and Exclude Expert Testimony [D.E. 80]; and (4) Plaintiff's Motion to Exclude or Limit Certain Opinions of Defendant's Expert Sally Kolitz Russell, Ph.D. [D.E. 81]. Each motion is fully briefed. [D.E. 86, 98 (as to D.E. 73); D.E. 88, 93 (as to D.E. 77); D.E. 91, 92 (as to D.E. 80); D.E. 87, 99 (as

to D.E. 81)]. Because the motions arise under the same rule and share a common framework, the Court resolves them together.[1]

The question in each of these four motions is the same: has the party offering an expert shown, more likely than not, that the witness is qualified to give the opinion, that its basis and method are reliable, and that it will help the jury? Applied to this case, the answers differ by witness. Plaintiff's Motion directed to Mr. D'Angelo [D.E. 73] is DENIED. Defendant's Motion directed to Plaintiff's own expert disclosures [D.E. 77] is GRANTED. Defendant's Motion directed to Ms. Ivery [D.E. 80] is GRANTED. Plaintiff's Motion directed to Dr. Russell [D.E. 81] is GRANTED IN PART, as to three matters Defendant does not oppose, but is otherwise DENIED.[2]

## *I. BACKGROUND*

Plaintiff, who proceeds pro se, alleges that on April 29, 2024, as he tried to disembark from the Navigator of the Seas at the San Pedro cruise terminal in California, Defendant's personnel physically stopped and detained him when he would not return to Guest Services to resolve an unpaid onboard balance. [D.E. 20]. Following the Court's earlier rulings, three claims remain: assault (Count I), battery (Count II), and false imprisonment (Count III). [D.E. 56; D.E. 60]. Defendant denies liability and asserts, among other defenses, that Plaintiff consented and that its

---

[1] The Court addresses the motions in numerical order. Plaintiff proceeds pro se, and the Court has construed his filings liberally. Where a citation in this Order refers to a page number, it refers to the page of the filing as docketed.

[2] On July 29, 2025, the Honorable Jacqueline Becerra referred all pre-trial matters to the Undersigned. [D.E. 24].

personnel acted in self-defense and in defense of others. [D.E. 61]. Plaintiff claims physical, psychological, and economic injury, including lost earning capacity. The incident was recorded by closed-circuit cameras and by body-worn cameras, and the parties' experts offer competing accounts of what the recordings show and what they mean.

The four motions track that dispute. Plaintiff seeks to exclude Defendant's security expert, who opines that Defendant's response was consistent with accepted security-industry use-of-force principles (D.E. 73). He then challenges Defendant's neuropsychologist, who opines that Plaintiff does not have a brain injury and that the incident did not exacerbate his post-traumatic stress disorder (D.E. 81). Defendant for its part seeks to exclude the expert opinions that Plaintiff has offered through his own disclosures (D.E. 77) and through a rebuttal witness who criticizes Defendant's security expert from a behavior-analysis perspective (D.E. 80).

## *II. LEGAL STANDARD*

### *A. __Rule 702__*

Federal Rule of Evidence 702 governs the admissibility of expert testimony. As amended effective December 1, 2023, it provides that a witness "qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that" the expert's specialized knowledge "will help the trier of fact to understand the evidence or to determine a fact in issue"; the testimony "is based on sufficient facts or data"; it "is the product of reliable principles and methods"; and the

opinion "reflects a reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702(a)–(d). The 2023 amendment was meant to correct decisions that treated the sufficiency of an expert's basis and the application of the expert's method as questions of weight rather than admissibility. Fed. R. Evid. 702 advisory committee's note to 2023 amendment. The Court simply asks whether the proponent has shown, more likely than not, that Rule 702's requirements are met. That standard governs every motion in this Order, and in each the party offering the expert bears the burden.

The Eleventh Circuit sorts that inquiry into three parts. The Court asks whether "(1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998); *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc) (Marcus, J.) ("The burden of establishing qualification, reliability, and helpfulness rests on the proponent of the expert opinion."). The three requirements are distinct, and the Court addresses them separately. *Ibid.*

***Qualification***. An expert may be qualified by "knowledge, skill, experience, training, or education," Fed. R. Evid. 702, and experience alone can suffice. *Frazier*, 387 F.3d at 1260–61. But a witness relying primarily on experience "must explain

how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." Fed. R. Evid. 702 advisory committee's note to 2000 amendment. Qualification in one field does not carry over to another; the Court may exclude an opinion where there is an insufficient nexus between the witness's credentials and the opinion offered. *See Frazier*, 387 F.3d at 1266. At the same time, qualification and reliability are different questions and must not be conflated. *Moore v. Intuitive Surgical, Inc.*, 995 F.3d 839, 852 (11th Cir. 2021) (holding that the district court abused its discretion by excluding a physician's causation testimony on the ground that he lacked familiarity with nuances of robotic surgery, a ruling that confused expertise with qualification). "[O]ne may be considered an expert but still offer unreliable testimony." *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003).

***Reliability***. The Supreme Court's non-exclusive factors are whether the theory or technique can be and has been tested, whether it has been subjected to peer review and publication, its known or potential rate of error, and whether it is generally accepted in the relevant field. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 593–94 (1993). The inquiry is flexible and applies to experience-based testimony as well, which must reflect "the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999). The Court need not accept an opinion because the expert says it is reliable. *See* Fed. R. Evid. 702 advisory committee's note to 2000

amendment (the gatekeeping function "requires more than simply 'taking the expert's word for it'"). And a court may exclude an opinion when "there is simply too great an analytical gap between the data and the opinion proffered." *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

***Helpfulness***. Helpfulness is a question of "fit." Expert testimony "which does not relate to any issue in the case is not relevant and, ergo, non-helpful." *Daubert*, 509 U.S. at 591 (citation omitted). The testimony must be tied to a fact the jury must decide. *McDowell v. Brown*, 392 F.3d 1283, 1298–99 (11th Cir. 2004); *United States v. Masferrer*, 367 F. Supp. 2d 1365, 1373 (S.D. Fla. 2005). Expert testimony does not help the jury when it merely repeats an inference the jury is as able to draw as the expert, or when it supplies argument in place of specialized knowledge.

## ***B. Rules 704 and 701***

Two further rules bear on these motions. Rule 704(a) provides that an opinion, lay or expert, "is not objectionable just because it embraces an ultimate issue." Fed. R. Evid. 704(a); *see also* Fed. R. Evid. 704 advisory committee notes. The Eleventh Circuit has drawn the line this way: "An expert may testify as to his opinion on an ultimate issue of fact. ... An expert may not, however, merely tell the jury what result to reach." *Montgomery v. Aetna Cas. & Sur. Co.*, 898 F.2d 1537, 1541 (11th Cir. 1990). *Montgomery* reversed a judgment because the expert in that case testified to a legal conclusion about the scope of a contractual duty. *Ibid.*

Rule 701, for its part, permits a lay witness to give opinions that are "rationally based on the witness's perception[,]" helpful to the jury, and "not based on scientific,

technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Rule 701 subsection (c) was added in 2000 to keep parties from evading the reliability requirements of Rule 702 by offering expert opinion as lay opinion. *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); *Williams v. Mast Biosurgery USA, Inc.*, 644 F.3d 1312, 1317 (11th Cir. 2011).

## *III. ANALYSIS*

### *A. <u>PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT MR. D'ANGELO [D.E. 73]</u>*

#### ***1. The Opinions and the Challenge***

Defendant retained Michael S. D'Angelo to address the conduct of its security personnel. Applying a forensic methodology drawn from his field and the International Association of Chiefs of Police use-of-force model, he reviewed the recordings and the deposition testimony and concludes, as relevant here, that the interaction escalated from an administrative engagement to a security response after Plaintiff declined repeated instructions and moved toward and made contact with security personnel; that the physical response was proportionate to Plaintiff's behavior; and that Defendant's personnel did not deviate from accepted security-industry standards. [D.E. 73-1 at 2, 8, 10–14].[3]

[3] The Court does not recite the full substance of Mr. D'Angelo's report. The parties agree on what the report says; they disagree about whether it may be received. Defendant concedes that Mr. D'Angelo's opinions "may embrace the ultimate issue." [D.E. 86 at 4–10].

Plaintiff, who has not meaningfully challenged Mr. D'Angelo's credentials, attacks the use to which the opinions would be put. He argues that Mr. D'Angelo repeatedly opines that Defendant's physical intervention was "proportional, reasonable, operationally justified, and caused by Plaintiff," and that these opinions "resolve disputed intentional-tort issues for the jury." [D.E. 73 at 2]. He argues that Mr. D'Angelo applies a security and use-of-force framework to what Defendant's own evidence shows was an administrative, unpaid-balance dispute. [*Ibid.*]. And he asks that Mr. D'Angelo be barred from telling the jury that Plaintiff "caused or drove the escalation" or engaged in "active resistance" or "active non-compliance," or, alternatively, that his testimony be limited in several respects. [D.E. 73 at 3; D.E. 98 at 2–10].

***2. Analysis***

Plaintiff's principal argument is that an expert who gives an opinion on an ultimate issue tells the jury how to decide it. As the Court understands the argument, it rests on an assumption about influence: because a jury will credit a credentialed expert, an opinion that embraces a disputed issue will carry the day. That is not the law. A good expert is supposed to be influential—it is demanded by Rule 702(a)'s helpfulness prong. *See* Fed. R. 702(a) (requiring that an expert testimony "help the trier of fact to understand the evidence or to determine a fact in issue"). Persuasiveness is why a party calls one, and Rule 704(a) abolished the old rule against opinions on ultimate issues precisely so that qualified witnesses could help

the jury with the questions it must decide. What the rule forbids is an expert who simply tells the jury what result to reach, or who instructs it on what the law means.

Plaintiff's own authority draws that line. In *Montgomery*, on which Plaintiff relies [D.E. 73 at 3], the Eleventh Circuit said in the sentence immediately before the one Plaintiff quotes that "[a]n expert may testify as to his opinion on an ultimate issue of fact." 898 F.2d at 1541. The court then said that an expert "may not, however, merely tell the jury what result to reach," and found error in that record because the expert had testified to the legal scope of a contractual duty, not to a fact in dispute. *Ibid*. *Montgomery* consequently does not bar an expert from taking a position on a contested fact. The additional prohibitions Plaintiff attributes to it (narrating the evidence, resolving disputed inferences) do not appear in the opinion at the page he cites.

*United States v. Grzybowicz*, 747 F.3d 1296 (11th Cir. 2014), shows how the principle works in practice. There a federal agent testified as an expert in computer forensics that the defendant had taken certain photographs with his cell phone and later downloaded them onto his computer. *Id.* at 1302–03, 1310. The defendant objected that whether he created the images was a question for the jury. The district court allowed the testimony because it rested on the agent's forensic examination, and the Eleventh Circuit affirmed. Writing for the panel, Chief Judge Carnes explained that the agent "did not tell the jury what to decide" or testify about the legal implications of the defendant's conduct; he gave an opinion grounded in his

examination of evidence that had been admitted. *Id.* at 1310. The jury remained free to reject the opinion, and was so instructed. *Id.* at 1310–11.

Along those same lines, Mr. D'Angelo's opinions rest on his review of the recordings, the testimony, and accepted security-industry standards. Whether Defendant's response was proportionate to Plaintiff's conduct is a question on which he may offer an opinion, and the jury remains free to reject it. See, e.g., *Samples v. City of Atlanta*, 916 F.2d 1548, 1552 (11th Cir. 1990) ("Detective Genson's opinion that the shooting was 'justified' meant only that he determined that the physical evidence supported Officer Oglesby's description of what had happened and that no criminal charges should be brought against the officer. We therefore find no reversible error in the admission of any of Detective Genson's testimony.").

Nor does it matter that the facts underlying Mr. D'Angelo's opinion are disputed. Plaintiff contends that the recordings do not show him pushing anyone and that he, not Defendant's personnel, was the one restrained. Mr. D'Angelo, by contrast, relied on testimony that Plaintiff pushed a security supervisor and moved against the officers at the gangway. [D.E. 73-1 at 10–14 (citing Anthikkad Dep. 38:22–24; Zamir Dep. 30:1–7)]. An expert "is ... permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury." *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) (O'Sullivan, M.J.) (quoting *Walker v. Gordon*, 46 F. App'x 691, 695–96 (3d Cir. 2002)) (internal quotation marks omitted). An expert cannot give any opinion about a contested event without assuming some version of it. If the jury rejects Mr. D'Angelo's

version of the facts, it may disregard his conclusions. *Feliciano* also illustrates how far the rule extends: the court there admitted an opinion that any use of force on the plaintiff would have been unlawful and excessive. *Id.* at 1265. The opinions at issue here are less conclusory.

Plaintiff's remaining arguments go to "fit" and weight. He contends that the encounter was nothing more than a billing dispute and that a security framework is therefore the wrong lens. It may be that the jury will see it that way. It may also see the events as a security matter from the start, or as a billing dispute that became a security matter at some identifiable point, for example when it watches the recordings of Plaintiff taking his passport from an employee's hand or moving toward and against the officers at the gangway. This is a case that can be understood in several ways, as the competing frameworks offered by the parties' experts show. It is not the Court's role to choose one in advance and impose it on the jury. Mr. D'Angelo's framework bears on the questions the jury must answer, including whether Defendant's personnel acted with the intent the torts require and whether their conduct was privileged, so it fits. See, e.g., *Sorrels v. NCL (Bahamas) Ltd.*, 796 F.3d 1275, 1285 (11th Cir. 2015) ("Cross-examination and the presentation of contrary evidence 'are the traditional and appropriate means of attacking shaky but admissible evidence.'") (quoting Daubert, 509 U.S. at 596) (reversing exclusion of expert based on sufficient evidence supporting plaintiff's theory of liability).

Plaintiff may test the framework on cross-examination and may offer contrary evidence, as *Daubert* requires. 509 U.S. at 596. The Court is also satisfied, on the

record before it, that Defendant has shown that it is more likely than not that Mr. D'Angelo's opinions rest on sufficient facts and a reliable application of his method. Fed. R. Evid. 702(b)–(d). The facts Plaintiff disputes do not change that finding. Mr. D'Angelo relies on deposition testimony that Plaintiff pushed a security supervisor and moved against the officers at the gangway, and the recordings are in the record. An expert may rest an opinion on one version of disputed facts so long as that version finds support in the record, and the testimony Mr. D'Angelo cites supplies it. If the jury rejects that version, it may disregard the conclusions that depend on it.

The ruling is not boundless. Mr. D'Angelo may opine that the conduct of Defendant's personnel was or was not consistent with accepted security-industry practice and, if his foundation supports it, that the force used was proportionate to the behavior he describes when measured against those standards. Opinions of that kind are admissible when they are framed by the prevailing standards of the profession, and the Court expects the questions and answers at trial to be framed the same way. *See, e.g., Samples,* 916 F.2d at 1551; *United States v. Myers,* 972 F.2d 1566, 1577–78 (11th Cir. 1992) ("In light of the questioning and answers given, we find that, as with the testimony in *Samples*, Baker properly framed his opinion in accordance with prevailing police standards. The court did not err in admitting his testimony.").

. He may not instruct the jury that Defendant's conduct was "lawful," "privileged," or "justified" in the legal sense, tell the jury that any element of assault, battery, or false imprisonment is or is not satisfied, or opine on the law governing a carrier's authority to detain a passenger. *Montgomery*, 898 F.2d at 1541. Nor may he

simply narrate what the recordings show. Observations drawn from the recordings are admissible only when he connects them to the specialized knowledge on which his opinion rests. *See Prosper v. Martin,* 989 F.3d 1242, 1249–50 (11th Cir. 2021). Plaintiff may object at trial to any question or answer that crosses the line. He can also seek to strike the testimony, or portions thereof, to the extent the expert's ultimate trial testimony falls outside the guardrails imposed by *Montgomery*. See, e.g., *Baker v. Viehmann*, No. 8:21-CV-2851-SCB-SPF, 2023 WL 3664573, at *3 (M.D. Fla. Feb. 21, 2023) ("whether Pusins' testimony will include improper legal conclusion can only be determined by the questions asked and the answers given at trial. As such, Viehmann's request to exclude Pusins' 'legal conclusions' in general is denied, and any objections to Pusins' testimony in this regard may be resolved during trial.").

Plaintiff's Motion [D.E. 73] is therefore DENIED, without prejudice to Plaintiff's right to make specific, contemporaneous objections at trial consistent with this Order.

### B. DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S HYBRID AND PRO SE EXPERT DISCLOSURES [D.E. 77]

#### 1. The Disclosures

Not satisfied with his role as client and lawyer, Plaintiff has served three documents in which he designates himself as an *expert*: (1) a Rule 26(a)(2)(C) Hybrid Expert Disclosure and Economic Damages Report on his lost earning capacity [D.E. 77-1]; (2) a rebuttal to the report of Defendant's psychiatrist, Dr. Allen Singer [D.E. 77-2]; and (3) a combined rebuttal to the reports of Defendant's orthopedic surgeon, Dr. Douglas Hollern, and neurologist, Dr. Brad Herskowitz [D.E. 77-3]. Defendant

moves to strike all three and to preclude Plaintiff from offering expert opinions at trial under Rules 403, 701, and 702.

The economic report projects Plaintiff's federal salary through age sixty-five on a "fixed" and a "growth" model, and then estimates additional earnings he says he lost by withdrawing from a doctoral program and delaying work in the legal and academic fields. [D.E. 77 at 4–9]. The growth model rests on a 1.63% annual raise drawn from a website that disclaims any government affiliation; the estimate of lost academic and legal income assumes an annual $50,000 increment and a 15% "growth adjustment," and a further $100,000 for delayed market entry that the report supports with a citation to an article but does not explain how the article yields the figure. [*Id.* at 7–10; D.E. 88 at 6].

The rebuttals to the medical experts criticize their findings and conclude that the incident "materially aggravated" Plaintiff's preexisting post-traumatic stress disorder and aggravated his lumbar pathology. [D.E. 77 at 5–6 (quoting D.E. 77-2 at 5 and D.E. 77-3 at 5)].

### ***2. Analysis of Plaintiff's Qualifications***

Plaintiff holds bachelor's and master's degrees in electrical engineering, has co-authored an article on self-driving vehicles, earned a juris doctor in 2024, and has worked as an equal employment specialist for a federal agency. [D.E. 77 at 5]. But none of that supplies the specialized knowledge on which the opinions in these documents depend. Plaintiff does not claim to be an economist or a vocational-rehabilitation specialist, and he testified that he is not an economist. [D.E. 77 at 5

(citing Stewart Dep. 57:16–17); D.E. 88 at 2, 4]. He does not claim to be a psychiatrist, a neurologist, or an orthopedic surgeon, or to be trained in diagnosing or treating any condition. [D.E. 88 at 2]. His argument is that his training qualifies him to "perform and explain transparent mathematical calculations from identified data." [D.E. 88 at 4]. That may be so for some arithmetic that falls within his personal knowledge (i.e., how much he earns on a regular basis or what his expected earnings are). But it does not follow that he is qualified to decide which economic model fits a projection of earnings across a working life, which growth assumptions are reasonable, or what a person with his credentials would have earned in careers he has not held. *See Frazier*, 387 F.3d at 1266. The insufficient nexus between his credentials and those opinions ends the inquiry as to them. *See id.* at 1260.

The medical rebuttals fail for the same reason, and for an independent one. Where an injury is not readily observable, the Eleventh Circuit requires medical expert testimony to prove causation. *Willis v. Royal Caribbean Cruises, Ltd.*, 77 F.4th 1332, 1337–38 (11th Cir. 2023). Whether a preexisting psychiatric condition or a lumbar condition was aggravated by a particular event is a question of that kind, and a pro se litigant's opinion on it is no substitute for a physician's. Plaintiff does not argue otherwise. He disclaims any intent to diagnose himself, interpret medical imaging, or independently establish medical causation. [D.E. 88 at 2, 7–9]. He also concedes that a sentence stating that the evidence supports a "medically reasonable conclusion" of aggravation "cross[es] into specialized medical-causation territory,"

and says he "does not insist upon" offering it. [*Id.* at 8–9]. These concessions resolve the question as to the Singer and Hollern/Herskowitz rebuttals.

### *3. Plaintiff's Opinions are Unreliable*

The Court reaches the same conclusion as to reliability. An expert's assertion that his method is "structured and reproducible" does not make it so. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment. The economic report does not identify the economic principles on which it relies, and its most consequential inputs are unsupported assumptions: the source of the 1.63% growth rate is a non-governmental website, and the report offers no stated basis for the $50,000 annual increment or the 15% adjustment. Nor does it explain how the article it cites produces the $100,000 delayed-entry figure. [D.E. 77 at 7–10]. Indeed Plaintiff does not defend those inputs. He acknowledges that they rest on assumptions and that the Court may exclude them. [D.E. 88 at 6]. Unsupported assumptions about earning capacity are a recognized ground for excluding an economic opinion that depends on them. *See Buland v. NCL (Bahamas) Ltd.*, 992 F.3d 1143, 1151 (11th Cir. 2021). And the report's inference from timing, that because Plaintiff's grades fell after the incident, the incident caused the decline, is an inference of causation presented without a method for testing it. [D.E. 77 at 8–9].

### *4. Plaintiff's Lay Opinions*

Plaintiff argues that, even if he is not an expert, Rule 701 allows him to give lay opinions based on particularized knowledge. [D.E. 88 at 4]. He relies on *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*, 320 F.3d 1213 (11th Cir. 2003),

in which company officers who prepared the work and the bills were allowed to testify about the reasonableness of the charges. That case rests on a witness's direct participation in the events about which he testifies, and allows him to compare "similar services provided by other similar operations," 320 F.3d at 1219, which the witness had actual experience in. Plaintiff can certainly testify to his own earnings, but a projection of earnings over decades in careers he has not entered is not a perception of his own; it is an exercise that depends on the specialized knowledge Rule 701(c) excludes. *Henderson*, 409 F.3d at 1300. The same is true of any opinion about the cause or aggravation of his medical conditions. Having designated these documents as expert disclosures under Rule 26(a)(2)(C), Plaintiff cannot also treat them as lay opinion.

To the extent Plaintiff offers true lay opinions at trial, which are within his personal knowledge and that fell within the parameters of Rule 701, he can certainly introduce them. Defendant's Motion is directed to his expert opinions. And its reply Defendant confirms that it does not seek to preclude Plaintiff from testifying as a fact witness to matters within his personal knowledge. [D.E. 93 at 1–2, 6]. The Court therefore does not rule on that testimony. Plaintiff may testify, subject to the Rules of Evidence and to objections at trial, to what he personally perceived and experienced: his earnings history and employment records within his knowledge, the symptoms he felt and when he felt them, the treatment he sought, and what he meant by his own statements to providers. He may describe his own conduct on the recordings. What he *may not* do is offer opinion testimony within the scope of Rule

702: projections of lost earning capacity, opinions that the incident caused or aggravated a medical condition, or criticism of Defendant's medical experts' methods and conclusions presented as expert opinion. *See, e.g.*, *Awodiya v. Ross Univ. Sch. of Med.*, No. 18-CV-60482-KMM, 2019 WL 13255302, at *3 (S.D. Fla. Mar. 2, 2019) ("While a lay witness may testify to very elementary mathematical operations such as those 'well within the ability of anyone with a grade-school education, lay testimony about lost profits based on more sophisticated economic models is impermissible.'") (quoting *James River Ins. Co. v. Rapid Funding, LLC*, 658 F.3d 1207, 1214 (10th Cir. 2011)).

The Court also does not decide whether Plaintiff can carry his burden of proof on lost earning capacity or on medical causation without such expert testimony, or whether any particular document or calculation may be received as an exhibit or a demonstrative. Those questions are not before the Court and can be raised at the appropriate time.

Defendant's Motion [D.E. 77] is thus GRANTED. Plaintiff's Rule 26(a)(2)(C) Hybrid Expert Disclosure and Economic Damages Report, his Pro Se Rebuttal to Dr. Singer's report, and his Combined Pro Se Rebuttal to the reports of Dr. Hollern and Dr. Herskowitz are STRICKEN to the extent they purport to offer expert opinions, and Plaintiff is PRECLUDED from offering expert opinion testimony at trial. This ruling is without prejudice to Plaintiff's testimony as a fact witness with admissible lay opinions as described above.

### C. *DEFENDANT'S MOTION TO STRIKE THE REBUTTAL DISCLOSURE OF DONNA IVERY [D.E. 80]*

#### 1. *Ms. Ivery's Disclosure and the Rebuttal Framework*

Plaintiff designated Donna Ivery, Ed.M., as a rebuttal witness to Mr. D'Angelo. Ms. Ivery describes herself as a "Registered Behavior Technician and behavioral-analysis practitioner," and her report offers what she calls a "behavioral-analysis" rebuttal. [D.E. 80-1 at 1–2, 8]. She concludes that Mr. D'Angelo's report "insufficiently applies accepted behavioral-analysis methodology," that the escalation of the encounter was "significantly influenced by antecedent environmental restriction and conflicting detention-related communication," and that the antecedent conditions "likely contributed substantially to provoking and intensifying the escalation dynamics reflected throughout the interaction." [*Id.* at 25–26]. Plaintiff offers her as someone who examines whether the conduct "occurring immediately before" Plaintiff's movement is behaviorally relevant to interpreting what followed, from a starting point materially different from Mr. D'Angelo's. [D.E. 91 at 2]. Defendant moves to strike her under Rules 403, 701, and 702, and argues that she is not a proper rebuttal witness because she does not address the same subject matter as Mr. D'Angelo. [D.E. 80 at 4–10; D.E. 92 at 1–3].

A rebuttal expert may offer evidence "intended solely to contradict or rebut evidence on the same subject matter identified by another party" under Rule 26(a)(2)(B) or (C). Fed. R. Civ. P. 26(a)(2)(D)(ii). The Court must determine whether a proposed rebuttal opinion meets that standard. *Lebron v. Royal Caribbean Cruises, Ltd.*, No. 16-24687-CIV, 2018 WL 3583002, at *2 (S.D. Fla. July 26, 2018) (Simonton,

M.J.). A rebuttal expert need not share the initial expert's credentials and "rebuttal opinions are permitted when they directly address an assertion raised by an opponent's experts." *Ibid.* But a party may not use rebuttal to "advance new arguments or present new evidence." *Ibid.*

Defendant argues that Mr. D'Angelo's opinion addresses whether Defendant's security response was consistent with security-industry standards while Ms. Ivery's behavioral analysis is a very different matter. [D.E. 92 at 1–2]. The problem with this argument is that cases like *Lebron* read "same subject matter" broadly, and Ms. Ivery's report, like Mr. D'Angelo's, generally addresses how the encounter escalated and whether Defendant's personnel contributed to it. Mr. D'Angelo concludes that the interaction progressed after Plaintiff "declined to comply with repeated instructions" and moved against security personnel [D.E. 73-1 at 9–10]; Ms. Ivery opines that Defendant's own conduct provoked the escalation. On a broad reading, that is a response to an assertion of Defendant's expert. The Court therefore assumes, without deciding, that the "same subject matter" factor favors Plaintiff.

Yet this finding cannot carry the day. Rule 26(a)(2)(D)(ii) is a limit on what a rebuttal expert may address, not a substitute for Rule 702; a rebuttal expert is still an expert and must be qualified, must use reliable methods, and must be helpful. Fed. R. Evid. 702. Ms. Ivery fails each requirement.

### *2. Qualifications for Ivery's Opinion*

Plaintiff offers Ms. Ivery as an expert in a form of behavior analysis. The question now is whether her qualifications fit the opinions she gives, which concern

the conduct of cruise-line security personnel during a disembarkation dispute. They do not. *See Frazier*, 387 F.3d at 1266.

Start with the credential that gives her disclosure its name. Ms. Ivery's Registered Behavior Technician certification is inactive. The certifying body states that "[w]hile your certification status is inactive, you cannot use your RBT certification under any circumstances." [D.E. 80-3 at 19]. And even an active certification qualifies a holder only to "assist in delivering behavior-analytic services" under "the direction and close supervision" of a supervisor "who [is] responsible for all work RBTs perform." [D.E. 80-3 at 5]. On the face of this basic qualification, it would seem Ms. Ivery fails a predicate test for admission of an expert opinion.

Plaintiff does not defend the inactive credential; his answer is that Ms. Ivery simply should not represent it to the jury. [D.E. 92 at 2 (describing D.E. 91)]. Fair point, given that a witness can be an expert without a particular license or certification, and a lapsed credential does not erase knowledge or experience. Analogously, a law professor who has let a bar membership lapse may still be a well-qualified expert on the law. Legislatures regularly consult non-barred law professors, for example, and they can similarly testify in a case where their expertise can be helpful even without a current license to practice.

Nevertheless the problem for Ms. Ivery is not the status of her certification. It is what the certification and the rest of her background show about the subject she was retained to address. Applied behavior analysis, as the credentialing body describes it, is "best known as being the leading evidence-based treatment approach

for autism and other developmental disabilities." [D.E. 80-4 at 1 (BACB fact sheet)]; *see also Perez v. Lake Cnty. Rowing Ass'n*, No. 5:19-CV-661-OC-30PRL, 2021 WL 405505, at *11 n.1 (M.D. Fla. Jan. 5, 2021 (describing applied behavior analysis as an evidence-based intervention for autism spectrum disorder). Nothing in the materials in this record describes it as a recognized approach to evaluating security responses, use-of-force decisions, or disputes between passengers and a cruise line.

In other words, the question here is whether her background connects to the opinions she gives. Expertise on one subject does not qualify a witness on a distinct one. *See Cordoves v. Miami-Dade County,* 104 F. Supp. 3d 1350, 1357–62 (S.D. Fla. 2015) (ADA-compliance expert was qualified to address adequacy of personnel training but not whether a dog was a service animal, because the two subjects were distinct). Ms. Ivery's report does not identify a method that ties her opinions to this case. It invokes an "ABA-informed behavioral-analysis methodology" and states the method in one clause: "escalation behaviors are evaluated in relationship to antecedent environmental conditions." [D.E. 80-1 at 12]. That falls far short of what is necessary under Rule 702.

Ms. Ivery's curriculum vitae does not fill the gap. She holds a bachelor's degree in sociology and a master's degree in education. She is enrolled in a post-graduate program in applied behavior analysis that, according to her own CV, is "pending residency," and in a doctoral program in instructional design leadership, which she describes as a "systematic methodology (rooted in instructional theories and models) to design and develop content, experiences, and other solutions to support the

acquisition of new knowledge or skills." [D.E. 80-1 at 35]. She does not explain what those theories or models are or how they bear on this case. Since 2014 she has worked as an ABA therapist, with a focus on individuals with behavioral disorders and autism. [*Id.* at 35–36]. In 2011 she worked for a month or two at NASA in a role she does not describe. [*Id.* at 36]. The Court sees no basis in this record to find that this experience bears on the issues in the case.

Plaintiff points, with some force, to the one entry on the CV that touches security. From 2012 to 2017 Ms. Ivery worked part time as a "Security Assessment Team Member," where she "[c]onducted federal and state-mandated school and academic environment security protocols and crisis management preparedness," including security assessments, staff interviews, drills for active-shooter and hostile-intruder response, and conflict resolution. [D.E. 80-1 at 36]. Her sole peer-reviewed publication is titled *Addressing Violence among Students with Disabilities in Schools*. [*Id.*]. That experience gives her some familiarity with school security planning. But it concerns a different setting, a different kind of event, and a different task: preparing campuses for violent intruders, not evaluating whether crew members who stopped a passenger from leaving a gangway over an unpaid balance responded in a manner consistent with security-industry standards. Nothing here suggests that the work involved evaluating the use of physical force by private security personnel, and Ms. Ivery does not say how it would permit her to do so. The "insufficient nexus" between her qualifications and the opinions she offers is plain. *Frazier*, 387 F.3d at 1266. Defendant is correct that Ms. Ivery may be qualified in some subject, but she is

not qualified in the one Mr. D'Angelo addressed, she is not qualified in a subject matter relevant to this case, and so she cannot be a qualified rebuttal expert here. [D.E. 92 at 2].

### *3. Reliability*

Ms. Ivery's methodology is as thin as her qualifications. Her report repeatedly invokes an "ABA-informed behavioral-analysis methodology," and the phrase "from a behavioral-analysis perspective" appears many times. [D.E. 80-1 at 12, 25–26]. Defendant describes the report as "almost entirely ... subjective interpretations of the events at issue cloaked in assurances that her opinions are offered from a behavioral-analysis perspective." [D.E. 80 at 8]. The Court agrees. The behavioral-analysis method is summarized in a single clause: "escalation behaviors are evaluated in relationship to antecedent environmental conditions." [D.E. 80-1 at 12]. That is true as far as it goes (events do not happen in a vacuum), but it is not a method, and it is an academic way of describing cause and effect. Ms. Ivery does not explain what standards govern her "antecedent-behavior-consequence" analysis, "escalation-cycle assessment," or "environmental contingency analysis," how she applied them to the recordings, why they are accepted tools in any field for evaluating a security response, or how they lead reliably to the conclusions she draws. *See* Fed. R. Evid. 702 advisory committee's note to 2000 amendment; *Joiner*, 522 U.S. at 146.

Plaintiff's response is unpersuasive. He submits peer-reviewed literature on behavior analysis. [D.E. 91-1]. But Ms. Ivery's report does not say she relied on any of it, and Plaintiff does not contend she did. [D.E. 92 at 2]. The articles describe

functional assessment and treatment of behavior disorders in people with intellectual and developmental disabilities. [*Id.* at 2–3]. They establish that the field exists. They do not show that its methods are reliable when applied to an encounter between security personnel and a passenger, and a lawyer's later citation to literature the expert did not use cannot supply a methodology the expert did not describe. The conflict-management training materials on which Ms. Ivery also draws are likewise not connected to any principle or method of behavior analysis that she applied. [D.E. 92 at 4]. The result is the kind of "analytical gap between the data and the opinion proffered" that *Joiner* criticizes. 522 U.S. at 146. Plaintiff has not shown that it is more likely than not that Ms. Ivery's opinions are the product of reliable principles and methods reliably applied. Fed. R. Evid. 702(c)–(d).

### *4. Helpfulness*

Even if Ms. Ivery were qualified and her method reliable, her opinions would not help the jury. Testimony is helpful only if it is reasonably expected to assist the jury in resolving a fact of consequence. *Masferrer*, 367 F. Supp. 2d at 1373; *McDowell*, 392 F.3d at 1298–99. The torts that remain turn on intent, consent, and privilege. [D.E. 80 at 10]. Ms. Ivery's report is largely a narrative of the recordings, recast in the vocabulary of behavior analysis, together with conclusions that the encounter was a civil dispute, that Defendant's personnel provoked the escalation, and that the response was "behaviorally" disproportionate. Her report states, for example, that "escalation intensity increased following movement restriction, physical interception, crowding-related behaviors, close-proximity positioning, repeated administrative

directives, and continued efforts to prevent forward movement after verbal assurances that detention was not occurring." [D.E. 80-1 at 25]. A jury can watch the recordings and draw that inference, or reject it, without an expert. What she adds is a label, not specialized knowledge. And when she states that Mr. D'Angelo failed to apply certain analyses, she does not say why he should have, or why the omission matters to any question the jury must answer. [*Id.* at 26]. Plaintiff's counsel, not an expert, may argue that Defendant's conduct provoked the escalation, and Plaintiff may cross-examine Mr. D'Angelo on the framework he chose. That is how the jury will receive the competing frameworks Plaintiff wants it to consider.

Ms. Ivery cannot fill the gap as a lay witness either. She did not perceive the events, so her opinions are not "rationally based on the witness's perception" and they are in any event founded on the specialized knowledge Rule 701(c) excludes. Fed. R. Evid. 701(a), (c). The Court need not separately reach Rule 403 but that would likely not help matters for Ms. Ivery if it did.

Defendant's Motion [D.E. 80] is GRANTED. Plaintiff's Rebuttal Expert Disclosure of Donna Ivery is STRICKEN, and Ms. Ivery is PRECLUDED from offering expert opinion testimony at trial. The Court's ruling rests independently on qualification, on reliability, and on helpfulness, each of which Plaintiff has failed to establish, and it would be the same if Ms. Ivery's opinions were treated as a proper rebuttal to Mr. D'Angelo.

### *D. PLAINTIFF'S MOTION TO EXCLUDE OR LIMIT DR. RUSSELL [D.E. 81]*

#### *1. Dr. Russell's Evaluation and the Challenge*

Defendant retained Sally Kolitz Russell, Ph.D., a neuropsychologist, to evaluate Plaintiff's claim that the incident caused a brain injury. Dr. Russell reviewed Plaintiff's pre- and post-incident records, his interrogatory answers, and his deposition; conducted a clinical interview of nearly two hours; and, with a psychometrician, administered a battery of tests over two days in February 2026. [D.E. 87-1 at 1–12]. The battery covered intellectual, executive, spatial-perceptual, psychomotor, motor, perceptual, memory, and emotional functions, including measures of effort and validity. [*Id.* at 12–13]. Dr. Russell scored the results against norms for Plaintiff's age and education using the Halstead Russell Neuropsychological Evaluation System-Revised ("HRNES-R"). [*Id.* at 13]. She concludes that the results were "not consistent with brain injury," that Plaintiff performed well on the tasks most sensitive to brain impairment, that his memory results were internally inconsistent, and that, because he failed one validity measure (the NV-MSVT), the evaluation "cannot be considered totally valid." [*Id.* at 17, 19–20]. She also concludes that the incident did not exacerbate Plaintiff's post-traumatic stress disorder. [D.E. 87-3 at 38:7–14].

Plaintiff does not challenge Dr. Russell's qualifications, and his challenge to helpfulness is confined to three statements discussed below. [D.E. 87 at 2 & n.1]. Instead he makes four principal arguments. First, that her validity and memory opinions are unreliable because she did not account for a December 2023 evaluation

by another psychologist, Dr. Lisa Blum. Second, that Defendant should be barred from suggesting that Dr. Russell concluded he does not have PTSD, or that her testing excluded it, and that her testimony should be limited to what she said in deposition. Third, that several "speculative" comments in her report should be excluded. And, fourth, that at least her testimony should be limited to the objective results of her testing. [D.E. 81 at 3–16].

### *2. Analysis*

*a) <u>The Blum evaluation</u>*

Dr. Russell's methodology is well established. The HRNES-R battery is standardized and co-normed on a population that includes individuals diagnosed with brain damage by neurologists and individuals without it; it has been independently evaluated and is accepted in clinical practice; and Dr. Russell has published peer-reviewed work on it. [D.E. 87-1 at 20; D.E. 87-3 at 12:17–14:17; D.E. 87 at 5]. She explained why a psychometrician's assistance is customary in neuropsychology, and Plaintiff does not argue otherwise. [D.E. 87-1 at 11; D.E. 87-3 at 21:1–16]. The testing is within her clinical practice, and Plaintiff, who does not dispute any of this, concedes that the battery is standardized, peer-reviewed, and generally accepted. [D.E. 99 at 2]. That satisfies the reliability prong of Rule 702(c).

Plaintiff's argument is about application, Rule 702(d), and about basis, Rule 702(b). He contends that Dr. Russell criticized his memory profile as "not mak[ing] neurological sense" without considering Dr. Blum's pre-incident testing, which, he says, showed the same pattern on two overlapping tests. [D.E. 81 at 3–7]. But

Defendant has shown that Dr. Russell's opinion rests on sufficient facts and reliable application of her method.

First, the timing. Plaintiff did not produce Dr. Blum's report until April 20, 2026, more than a month after Dr. Russell completed her report on March 4, 2026, and eleven days after Defendant served its expert disclosure. [D.E. 87 at 4 (citing [D.E. 84-6])]. Defendant requested it only after counsel noticed it was discussed in the report of Plaintiff's therapist. [*Id.*]. Plaintiff had mentioned Dr. Blum to Dr. Russell during the interview, but described the testing only as an evaluation for attention-deficit/hyperactivity disorder. [D.E. 87-1 at 10]. An expert's opinion is not unreliable because it does not account for a report the proponent had not been given. Dr. Russell reviewed the report before her deposition and testified that it did not change her opinions. [D.E. 87 at 6 (citing D.E. 87-3)].

Second, the scope of the Blum evaluation. Dr. Blum's testing was a limited evaluation conducted for Plaintiff's efforts to secure testing accommodations as a law student, not a comprehensive neuropsychological assessment, and it was only partially objective. [D.E. 87-3 at 42:18–43:11, 51:8–53:17]. Dr. Russell testified that the two tests Dr. Blum and she both administered were a small part of a larger battery on which Plaintiff generally performed well. [*Id.* at 63:2–19]. Her view that the overall pattern did not make neuropsychological sense considered that battery as a whole, including the finding that he did worse on easier memory tasks than on harder ones, and on her review of the validity measures, not on the two overlapping tests alone. [D.E. 87-1 at 16–17, 19–20].

Third, Plaintiff's strongest point does not undermine the methodology. Dr. Russell agreed at deposition that Plaintiff's results on digit span and similar working-memory tasks were consistent with Dr. Blum's findings and, if anything, reflected greater difficulty on those tasks in her own testing. [D.E. 81 at 4–6 (citing D.E. 87-3 at 46:1–24, 48:1–25, 49:1–9, 64:2–24)]. That is relevant to how persuasive her inference of inconsistent effort is, and a jury may weigh it against her view that his results on other tests were normal. But the overlap does not show that she applied her method unreliably. Her opinion that Plaintiff has no brain injury rests on his normal results on the tasks most sensitive to brain impairment. [D.E. 87-1 at 19]. Her view that the evaluation "cannot be considered totally valid" because he failed the NV-MSVT is disclosed in her report, together with the fact that he passed another validity test and showed no exaggeration on a third. [*Id.* at 17, 20]. Dr. Russell's candor about the limits of her evaluation counts in favor of reliability. The Court has found, for the reasons just given, that Dr. Russell reliably applied her method: she reviewed the Blum report before her deposition, the overlapping tests were a small part of a larger battery, and she disclosed the limits of her evaluation. What remains is the persuasive force of her inference, which Plaintiff may again test on cross-examination. *Daubert,* 509 U.S. at 596.

Finally, Plaintiff is right that Dr. Russell testified that review of historical records and consideration of alternative explanations are part of accepted methodology. [D.E. 81 at 5–6 (citing D.E. 87-3 at 20:8–23)]. But she reviewed extensive pre-incident records and considered alternative explanations, including a

history of PTSD, sleep apnea, and attention-deficit disorder. [D.E. 87-1 at 1–10, 20]. Her failure to review one limited report before she wrote her own is not a departure from that methodology that makes her opinion unreliable. The Court therefore declines to exclude or limit Dr. Russell's opinions about Plaintiff's memory profile, his validity testing, or the absence of brain injury on this ground. Plaintiff can certainly explore these criticisms on cross-examination at trial, but there is no basis here to exclude them under *Daubert*.

*b) <u>Dr. Russell's opinions on PTSD</u>*

Plaintiff's second argument is less a challenge to the reliability of Dr. Russell's opinions than a request for a protective order that Defendant not mischaracterize them. The record is clear on the substance. Dr. Russell does not dispute that Plaintiff had PTSD before the incident and has it now. [D.E. 87-3 at 54:12–20, 55:3–6, 57:21–58:1, 65:1–2]. She testified that the Trauma Symptom Inventory-2 results, which were not consistent with a PTSD diagnosis, do not mean that Plaintiff does not have the disorder. [*Id.* at 58:5–14; D.E. 87-1 at 19]. Her disagreement is with the proposition that the incident exacerbated that condition. [D.E. 87-3 at 38:7–14, 54:12–20]. Defendant confirms all of this and represents that its counsel has no intention of arguing that Dr. Russell concluded that Plaintiff does not have PTSD or that her testing ruled it out. [D.E. 87 at 7]. Defendant and its witness are bound by those representations and that testimony, and Defendant may not argue to the jury, directly or by implication, that Dr. Russell concluded that Plaintiff does not suffer

from PTSD or that her testing disproved the diagnosis. Because Defendant agrees, there is no reason why such an Order should not be entered now, as Plaintiff seeks.

The remainder of the request is that Dr. Russell be confined to the opinions Plaintiff characterizes as the ones she "actually adopted." [D.E. 81 at 12–16]. Plaintiff cites no authority for confining a disclosed expert to an adverse party's summary of her opinions. Dr. Russell may offer the opinions disclosed in her report and developed in her deposition, subject to Rule 702 and to objection at trial. If her trial testimony strays from her disclosed opinions, Plaintiff may object and may impeach her with her prior testimony. *See* [D.E. 87 at 8]. A pretrial order directed to speculative future testimony is premature. This portion of Plaintiff's Motion is DENIED without prejudice to renewal by objection at trial.

*c)* *<u>The challenged "commentary"</u>*

Plaintiff identifies several passages in Dr. Russell's report that he contends are unsupported by any methodology. They fall into three groups.

*The "curious" observation.* Dr. Russell writes, after reviewing literature showing that PTSD can affect cognition, that "[i]t is curious if this gentleman actually is experiencing PTSD long-term and severe, why he is able to perform so well on cognitive testing." [D.E. 87-1 at 20]. That is an expert's observation about the relationship between Plaintiff's test results and the severity of the condition he claims, which she based on her testing and on the published research she cites. [*Id.* (citing Bremner, *Traumatic Stress: Effects on the Brain*, 8 Dialogues Clin. Neurosci. 445 (2006)]. Plaintiff may argue that it is a weak inference, particularly because Dr.

Russell has testified that Plaintiff has PTSD, and may cross-examine her accordingly. It is not so detached from her method that it must be excluded.

*The brain-injury "belief."* Dr. Russell notes that Plaintiff believes he has a brain injury. That is not an expert opinion at all. It is the premise of the evaluation: Plaintiff pleaded "symptoms of brain trauma" [D.E. 20 ¶ 120], described a concussion in his interrogatory answers [D.E. 87 at 1], and is the reason she was retained. The record Dr. Russell reviewed also includes a report from Plaintiff's treating physician, which Plaintiff acknowledges he drafted and the physician edited, listing white-matter changes on MRI. [D.E. 87 at 9 (citing D.E. 87-1 at 5–6; D.E. 77-3 at 3)]. Plaintiff may not exclude testimony that he holds a belief he has himself alleged. Dr. Russell's conclusion that he does not have a brain injury is plainly within her expertise and rests on a reliable battery of tests on which, she testified, he performed extremely well. [D.E. 87-3 at 60:4–11]. Defendant may elicit both.

There is one qualification. In the same paragraph, Dr. Russell states that the belief, "along with the stress of his legal case, would reasonably be a definite contribution to both his anxiety and depression." [D.E. 87-1 at 21]. That is a causal opinion, not background, and Defendant's response does not defend it; it defends only the statement of Plaintiff's belief. [D.E. 87 at 9]. Because Defendant, as the proponent, has not shown that the opinion rests on a reliable method as applied, Dr. Russell may not offer it unless Defendant first lays a foundation outside the presence of the jury. Her testimony that Plaintiff believes he has a brain injury is otherwise unaffected.

*The unopposed statements.* Finally, Defendant "does not oppose Stewart's motion to the extent he seeks exclusion of Dr. Russell's opinions that it is obvious Stewart did not receive sufficient psychological or psychiatric treatment, that he should be told he does not have a brain injury, and that resolution of this case should significantly help his anxiety and depression." [D.E. 87 at 9; *see also id.* at 2 n.1, 10]. But the Court also reiterates that Dr. Russell's report precedes her obtainment and review of any reports or documents drafted by Dr. Lisa Blum. Plaintiff asks the Court to grant the Motion as to those matters. [D.E. 99 at 9]. The Court does. Those opinions, which appear in the last two pages of the report, are not tied to any test result or method, and therefore do not assist the jury. [D.E. 87-1 at 21]. The Court notes that this ruling reflects Defendant's own position and does not rest on any finding about Dr. Russell's competence.

Plaintiff's Motion [D.E. 81] is thus GRANTED IN PART and DENIED IN PART. Except as stated in this Order, Dr. Russell's opinions are admissible under Rule 702, and Plaintiff may test them on cross-examination at trial. This Order does, however, preclude Defendant from arguing at trial that Dr. Russell concluded that Plaintiff does not have PTSD or that her testing disproved the diagnosis. [D.E. 87 at 7]. The motion is also Granted in so far as this Order excludes Dr. Russell's opinions at trial that it is obvious Stewart did not receive sufficient psychological or psychiatric treatment, that he should be told he does not have a brain injury, and that resolution of this case should significantly help his anxiety and depression.

## *IV. CONCLUSION*

For the foregoing reasons, it is ORDERED and ADJUDGED as follows:

1. Plaintiff's Motion to Exclude or Limit the Opinions and Testimony of Defendant's Security Expert Michael S. D'Angelo [D.E. 73] is **DENIED**, without prejudice to specific, contemporaneous objections at trial consistent with this Order. Mr. D'Angelo may not offer legal conclusions, including that any element of assault, battery, or false imprisonment is or is not satisfied, or that Defendant's conduct was legally privileged or justified.

2. Defendant's Motion to Strike Plaintiff's Hybrid and Pro Se Expert Witness Disclosures [D.E. 77] is **GRANTED**. The three disclosures are STRICKEN to the extent they offer expert opinion, and Plaintiff is PRECLUDED from offering expert opinion testimony at trial. This ruling is without prejudice to Plaintiff's testimony as a fact witness on matters within his personal knowledge, subject to the Rules of Evidence and to objection at trial.

3. Defendant's Motion to Strike Plaintiff's Rebuttal Expert Disclosure of Donna Ivery, Ed.M., RBT [D.E. 80] is **GRANTED**. The disclosure is STRICKEN, and Ms. Ivery is PRECLUDED from offering expert opinion testimony at trial.

4. Plaintiff's Motion to Exclude or Limit Certain Opinions of Defendant's Expert Sally Kolitz Russell, Ph.D. [D.E. 81] is **GRANTED IN PART and DENIED IN PART.** The Motion is GRANTED to the extent that Dr. Russell is PRECLUDED from testifying that it is obvious Plaintiff did not receive sufficient psychological or psychiatric treatment, that Plaintiff should be told he does not have a brain injury,

or that resolution of this case will significantly help his anxiety and depression. Dr. Russell may not offer the opinion that Plaintiff's belief about a brain injury and the stress of his legal case are a "definite contribution" to his anxiety and depression unless Defendant first lays a foundation outside the presence of the jury. And Defendant shall not argue or suggest that Dr. Russell concluded that Plaintiff does not suffer from post-traumatic stress disorder or that her testing excluded that diagnosis. The Motion is otherwise DENIED, without prejudice to specific, contemporaneous objections at trial.

**DONE and ORDERED** in Chambers at Miami, Florida, this 13th day of November, 2026.

/s/ *Edwin G. Torres*
EDWIN G. TORRES
United States Magistrate Judge